# REPORTS

OF

# CASES ARGUED AND DETERMINED

## AT JUNE TERM, 1853.

ESLAVA'S HEIRS *vs.* BOLLING & BOLLING.

1. The act of Congress of March 3, 1841, entitled "an act for the relief of the heirs of Miguel Eslava," was intended to furnish them and their adversaries, Hunt and Gazzam, with the evidence of a legal title, so that each party might have a standing, *prima facie*, in court, and thus be enabled to settle the question at issue between them by a judicial determination.

2. A grant made by the Spanish authorities after the treaty of St. Ildefonso, of lands situated within the territory of Louisiana, is void, although Spain had the actual possession of the province at the time of the grant.

3. The report of the register and receiver on Eslava's claim, under the provisions of the act of Congress of March 2, 1829, and the confirmation thereof by the act of March 3, 1841, does not conclude the question of possession as between Eslava's heirs and Hunt and Gazzam, but leaves it open to be controverted between them.

4. A void Spanish grant, accompanied by possession, and a survey of the land after the passage of the act of Congress of March 26, 1804, prohibiting such surveys, confer no title whatever on the claimants, when considered in the courts of justice, unless their possession is sufficient to bring them within the act of March 2, 1829, and create no obligation on the United States to recognize their claim.

5. When a claim to land is confirmed by the government, as a mere matter of favor to the grantee, prompted by a sense of moral duty, without any strict legal obligation, Congress has the undoubted right to prescribe the terms on which the title will be conferred, and to declare the effect of the confirmation as against other antagonistic claims.

ERROR to the Circuit Court of Mobile.

Tried before the Hon. LYMAN GIBBONS.

This was an action of EJECTMENT, by the plaintiff in error, to recover a tract of land situate in Mobile county, known as section No. 5, in township 5 south, of range 1. The defendants were admitted to defend as tenants in possession, under the usual consent rule; and having pleaded not guilty, a jury came who returned a verdict for them, and judgment was accordingly rendered against the lessors of the plaintiff for costs.

Upon the trial, a bill of exceptions was sealed by the presiding judge, which presents substantially the following case: The lessors of the plaintiff proved, that they were the heirs at law of Miguel Eslava, deceased; and they claimed title under a patent issued by the government of the United States on the 29th day of June, 1849, to the heirs of Miguel Eslava, in pursuance of the act of Congress passed the 3d day of March 1841, entitled "an act for the relief of the heirs of Miguel Eslava," which patent was read to the jury. It embraced four thousand, two hundred and thirty-one acres of land designated by metes and bounds according to a survey previously made and approved by the United States; and after reciting the act of Congress in virtue of which it was issued, and that several sales of land had been previously made by the government which conflicted with the survey, among which was the sale and patent to Audley H. Gazzam for five hundred and eight acres, of which the land in controversy constitutes a part, the United States government proceeds "to release, remise and forever quit-claim, unto the heirs of Miguel Eslava, and to their heirs, the land, &c., subject to any just claim or claims in virtue of any of the sales and patents aforesaid, or of any other claim or claims to all and every part thereof, of all and every person or persons, bodies politic or corporate, derived from the United States, or from either the British, French or Spanish authorities."

The defendants claimed title under a patent issued to Audley H. Gazzam, in virtue of the same act under which the patent had issued to the lessors of the plaintiff, dated the 13th day of April, 1841, and containing the following reservation:

"With the exception and reservation of all the rights of the Spanish grantees, (meaning the grantees intended in the act of 3d March, 1841,) their heirs and assigns, under the titles claimed by them under the Spanish government, to land embraced in claim No. 3, in report No. 2, of the register and receiver of the land office at St. Stephens, Alabama, acting as commissioners, and bearing date the 3d of May, 1832; this exception and reservation being intended to be according to the true intent and meaning of said act of 3d March, 1841."

The land in dispute was covered by both these patents, and the defendants produced in proof mesne conveyances from said Gazzam to them.

The plaintiffs also gave in evidence, from the translated Spanish records on file in the Probate Court of Mobile, copies of a petition by Miguel Eslava to the Spanish commandant, dated 9th February, 1803, setting forth his services to the Spanish government, and that finding his pecuniary condition doubtful "by reason of the cession (retro-cession) of the Province to the French Republic, or by a sale which is said to have been made of it to the United States of America, so far as the ancient limits, that is to say, the river Perdido, of this jurisdiction," &c.; and soliciting a grant of five thousand superficial arpents, from the pine lands belonging to Spain, a league from Mobile on the bayou named Durand, situate S. W. in its course, on the side of its channel upon Dog river, with a view of making an establishment thereon, binding himself "to pay the expenses of survey, which Joseph Collins, the deputy surveyor, will effect, in conformity with the accompanying figurative plat," &c.; and a copy of what purported to be a Spanish concession made upon said application, which sets forth that, "In consequence of the death of the assessor of this Intendancy, it is ordered by Don Juan Ventura Morales, Intendant *pro tem.* of this Province, that no petitions on matters relating to lands be sent to his office; and the prayer of the petitioner being just, I grant him the land he asks for, in order that he make, forthwith, the necessary clearings and erect suitable buildings, with the express condition, that, as soon as the office of the Intendant General of this Province is open, he shall have a valuation made of said lands, in conformity with the regulations of that office respect-

ing lands, and shall forward the proceedings therein to the Intendant, for the purpose of obtaining a regular title; this, in the mean time, serving as such, (dated) Mobile, 25 Feb., 1803. (Signed) JOAQUIM DE ORSONO."

Plaintiffs also made proof that Eslava, to whom the above concession purported to have been made, was a commissary under the Spanish government, and keeper of the public stores of the King, and a man of substance and influence in the port of Mobile, where he then resided.

They further read in evidence a certified transcript of the proceedings had upon said claim, as found in the land office at St. Stephens, embracing the petition of Eslava claiming, before the commissioner, "a tract of land situate on Dog river, containing five thousand superficial arpents, by virtue of a permit issued by Joaquim De Orsono," &c., (being the same above copied;) also the several reports made on said claim; a plat of what purported to be a Spanish survey by Joseph Collins, deputy surveyor, &c., purporting to have been made by him on the 20th April, 1804, in virtue of an order from Joaquim De Orsono, bearing date the 2d April, 1804; the report of the commissioner, William Crawford, adverse to said claim; a subsequent application, and an unfavorable report; and, finally, an application by the heirs of Miguel Eslava to the register and receiver of the land office at St. Stephens, acting as commissioner, under the act of March 2, 1829, who report that the applicants and their ancestors have had the land in possession from 1802 down to the date of their report, and recommend the same for confirmation, inasmuch as they found that the original claimant, or his legal representatives, were inhabitants, as required by the act of the 15th April, 1813, and on that day, and for ten consecutive years previous thereto, had been in possession. This report was forwarded on the 3d of May, 1832, and was not finally acted on until the 3d of March, 1841, when an act of Congress was passed confirming it, which act will be found copied in the opinion of the court.

The plaintiffs proved a survey by a deputy surveyor of the United States, under an order of survey and location issued from the land office at St. Stephens. This was made after the passage of the act of 1841, and in conformity with the Span-

ish plat of survey filed in the land office; and that he had duly returned said survey, which was afterwards approved by the government, as recited in the patent to the heirs of Eslava.

There was evidence tending to prove that Eslava was in the occupation of the land while Mobile was in possession of the Spanish authorities, but no one proved that he had any actual possession or occupation earlier than 1809 or 1810. The only evidence of a survey was a copy from the land office. No original Spanish survey was shown, nor was the existence of one proved.

It was admitted by the parties, on the trial in the Circuit Court, that while the claim of the plaintiff was being prosecuted before the government for confirmation, Hunt and Gazzam contested before Congress the authenticity of their alleged Spanish concession and survey, and the fact of inhabitation and possession by Eslava under the act of 1829.

The defendants relied upon the patent to Gazzam, and conveyances from him, and offered no other evidence of title.

The plaintiffs asked of the court the following charges to the jury:

1. That the claim of Eslava, when located, surveyed and patented under the provisions of the act of 1841, by force of said act and patent, and the proceedings under the act of 1829, became a confirmed title, and was, by the proper construction of said act of 1841 and of the patent issued under the same, a title superior and paramount to that vested in Gazzam by virtue of said act and the patent issued to him under its authority;

2. That, if the title so patented to Eslava was not, of itself, and by its proper construction, superior to that issued to Gazzam under the same act, then, as no title was shown by the defendants except under the act of 1841, the effect of the records of the claim of Eslava in the land office, and of the report in his favor under the act of 1829, would be to cause the title granted to Eslava by his patent to relate back, and give him a title anterior to the period when the act was passed; and being older in date than the title of Gazzam, it was superior, in point of law, to the title held by the defendants under him;

3. That the prior claim of Eslava under the Spanish gov-

ernment, his prior possession, his claim for confirmation, the proceedings had thereon, the reports of the commissioner and register and receiver, the confirmation by the United States, location, survey, and patent under the several acts of Congress relating thereto, would make the title in Eslava's heirs superior to that of Gazzam, derived under the act of 1841 by the patent to him, and would create a title paramount to it.

These several charges the court refused to give, and instructed the jury, in substance, that the true construction of the act of 1841, and the patents issued under it, was, to transfer the question of title, as between the heirs of Eslava and Gazzam, from the government of the United States to the courts for determination: that the act transferred to Gazzam all the title of the United States, and put him in the place of the United States; and that standing in the shoes of the government, he held the title, unless Eslava's heirs could show that they held a title under some one of the clauses of exception specified in the act and in the patent issued to them; that is to say, unless they could show a legal or equitable right under the law of nations, or under the constitution and laws of the United States, or treaties applicable to said Spanish concession: that the title of Eslava, taken by itself, would be a good title, against all the world, except as against Gazzam, and those claiming under him; but as to them, it could not avail, unless it could be sustained under one or the other of the exceptions contained in the act of 1841: that the Spanish concession was void, being made when Spain had no power to grant the land; but if the heirs of Eslava had proved that they came within the provisions of the act of 1829, then they had the better title.

The court also instructed the jury, that, to make out a good title under the act of 1829, it was incumbent upon Eslava's heirs to prove, that he had been in possession on the day named in the act, and for ten consecutive years preceding that date; and if the evidence before them did not establish such possession during said length of time, it would not suffice: that to constitute such possession as required by the act of 1829, it must be one which was defined, either actual or constructive, with fixed boundaries to the tract; that the survey on record would be sufficient to fix and define the boun-

daries (if they believe said survey was made when it bears date) from the date of said survey; but a mere claim, founded on a Spanish concession, as in this case, prior to the year 1804, (that being the date of the Spanish plat) without any fixed boundaries, or any thing else to separate it from the public domain, and without proof of any actual possession or occupation, would not be sufficient to answer the requirements of the act of 1829; that possession might be either actual or constructive; and constructive possession might be shown, by the fact that the land was vacant, and that a valid Spanish concession had issued for it at the date mentioned in the concession in evidence; but that the land must be so described in the concession, as to render it capable of being separated from the other public lands, and this the concession in evidence failed so to describe: that possession in fact could be shown by actual entry on the land, or the exercise of control over it, or an entry on a portion of the land and actual possession thereof with a claim upon the whole: that whether there had been this possession held for ten consecutive years prior to the 15th April, 1813, were questions of fact for the jury.

The plaintiffs requested the court to charge the jury, that the report of the register and receiver of the land office, to the effect that Eslava had been for ten consecutive years in possession before the 15th April, 1813, would, with the confirmation of that report, be sufficient evidence of that fact to support the title of the heirs of Eslava, as to that point; and that it was not necessary for them to make that proof by witnesses on the trial. This charge the court refused; but charged, that, although the report and confirmation would be conclusive against the government, it was not as against Gazzam; and that to entitle the plaintiffs to prevail, they must prove it by witnesses on the trial.

To the refusals of the court to charge as asked, and to the charges given, the plaintiffs excepted, and now assign the same for error in this court.

GEO. N. STEWART and P. HAMILTON, for plaintiffs in error:

The plaintiffs contend that the act of 1841, on its face, without more, gives them a title paramount to that of Hunt and Gazzam. The act makes the title of Hunt and Gazzam

subject to Eslava's, but it contains no clause making Eslava's subject to theirs. It confirms the decision of the register and receiver under the act of 1829, and directs patents to issue. Its provisions as to the effect of the patent, and as to its construction, are only what the law would imply without their insertion. The United States, being the grantee of France and Spain, could only convey what it obtained by its grant. 7 Peters 222 ; 5 Wheaton 308.

The title in fee was, incontestably, in the United States at the time of the passage of the act of 1841; and that act grants to Eslava's heirs a quit-claim of all the right and title of the United States, in and to the lands claimed by Eslava. This passes the whole title, *in praesenti*, even if the location of the grant had not been ascertained, and it wanted identity to make it perfect. Lessieur v. Price, 12 Howard 76.

But the act does more than this: it recognizes all the equity which plaintiffs may claim antecedently to that period, under the Spanish government, the treaty, and constitution and laws of the United States ; and adds to this the confirmation of the United States. This is as full right and title as could be given. It is said that our Spanish title is void, because Spain could not make a grant after she had ceded the province. As grants, such titles are void *ab initio*, and can never ripen into a good title. 13 Smedes & M. 168; 9 Howard 155. But this rule has no application to a case like ours, which is that of an incipient concession accompanied by possession. The possession under Spain was lawful, as she had the right to dispose of it while she held the territory, though not of the title. 2 Howard 603. If Spain had retained the territory, this possession would have been recognized as giving a claim for a title. The United States has succeeded Spain, and has done what it supposed Spain would have done. That Spain is to be considered as succeeded by the United States in this respect, see 2 Howard 374; 7 Peters 95. Claims of this kind have not been considered or treated as nullities before confirmation. 14 Peters 365; 2 Howard 603; 10 ib. 348.

Plaintiffs' claim has its inception and foundation under the Spanish government; it was protected by the treaty with France, and recognized by the United States under the obli-

gations created by that treaty; it was not a mere gratuity from the government, without any claim on its justice. By the terms of the treaty, the United States acquired only the " vacant lands;" this land was not vacant at the date of the treaty, but was in the possession of Eslava. It is immaterial whether Eslava's title was good, bad or indifferent; it has been recognized and confirmed, and this confirmation must be regarded as a confirmation under the treaty. The United States government has always decided for itself, as to what rights should be recognized under the treaty, and what not. It has not suffered the courts to do this, as to equitable titles at least. The established rule is, that the political power of the government has the right to decide how it will execute its treaty, and that the judicial power shall not defeat its action. 3 Howard 787; 9 ib. 155.

In execution of its treaty duty, the United States has enacted a series of laws for the benefit of Spanish claimants, aiming to reach and satisfy all classes of just claims. It has made no distinction between perfect and imperfect titles. It has confirmed titles lost by time or accident; and has made donations to those who had possession only, without claim of title. See what is said on this subject, in 9 Howard 151; 2 ib. 603; 4 Peters 512; 12 ib 436; 14 ib. 365; 12 Wheat. 601. Under these enactments, Eslava's claim was pressed upon the government at an early day, and constantly renewed at every opportunity until its final recognition and confirmation. Plaintiff's attitude was that of petitioners; they were obliged to wait the delays of the government, as they could not enforce their claim at pleasure. It is now no objection to the claim, that it was not admitted at an earlier day; it was not rejected, but only "suspended and protected" till finally confirmed. 2 How. 603.

The act of Congress of 1829 was induced by the treaty, and was passed for the benefit of Spanish subjects, (not of American citizens.) In defining the requisites to obtain a confirmation under that act, the whole consideration of the grant was placed on the ground of meritorious acts advantageous to Spain, viz: ten years' possession and a residence under the Spanish government.

If this, then, was a confirmation under the treaty, the title,

47

when perfected, relates back to its incipiency. 11 Howard 552; 12 ib. 77; 9 ib. 335; 10 ib. 372; 4 ib. 462; 13 ib. 244; 1 Peters 655; 13 Smedes & M. 161. But it is not necessary that our title should relate back so far, in order to render it paramount to that of Hunt and Gazzam, which was created by the act of 1841, and had no antecedent right. , If our confirmation only relates back to the filing of our petition under the act of 1829, our title will be superior to theirs.

The confirmation of Eslava's title made and reported by the commissioners in 1832, and expressly confirmed by the act of 1841, is conclusive, and cannot be overthrown by the courts; nor can it be inquired into, avoided or vacated. Neither can it be shown in any court that the facts did not exist which the act establishes, nor that the right did not exist. The courts have no jurisdiction to impeach that act of the sovereign power. 9 Howard 167; 10 ib. 370; 3 ib. 750; 13 Smedes & M. 161.

It is argued, that the effect of this act is only to refer the question of title to the courts for decision, and that therefore all the decisions under the act of 1824 apply to this case. This would be true, if our claim or title had not already been investigated and confirmed by the government itself; while, under the act of 1824, the very question to be decided was, whether the claimant was entitled or not to a confirmation. This question has already been decided in our favor, and by the highest authority.

JOHN A. CAMPBELL, contra:

The act of Congress of March 3d, 1841, was passed with the view of putting an end to the controversy between Eslava's heirs and Hunt and Gazzam. That act confirms Eslava's title, with all such legal and equitable rights as may exist under the law of nations, or under the constitution and laws of the United States, or treaties applicable to the said grants, under and by virtue of said Spanish grants.

The act of May 26, 1824, (4 U. S. Statutes at large 52,) was revived, and extended to Louisiana and other States in 1844 (5 ib. 676.) The second section of the act of 1824 contains the grounds upon which an incomplete title could be submitted to the court, and receive confirmation. The final

decree was "to settle and determine the question of validity of the title, according to the laws of nations, the stipulations of any treaty and proceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the government from which it is alleged to have been derived; and all other questions properly arising between the claimants and the United States." The cases which have been decided under this statute, are directly applicable to the present case. The position of Hunt and Gazzam is that of claimants from the United States, burdened with the maintenance of all such legal and equitable claims as Eslava might have under the laws of nations, treaties, or laws of the Union.

1. As to the laws of nations: The Supreme Court has decided, that no claimant has any just title, under the laws of nations, to any parcel of the land in Louisiana conceded by Spain after the treaty of St. Ildefonso, although before possession was given by the Spanish government to the French or American authorities. 9 Howard 127; 10 ib. 609; 12 ib. 47; 13 ib. 9. The Spanish grant is, therefore, void under the laws of nations.

2. The Spanish grant is void for want of compliance with its conditions. The commandant recites that he is forbidden to make concessions, but he grants an occupancy permit, and imposes as a condition that Eslava shall cause an appraisement to be made, and titles in due form to be given. 11 Howard 96; 12 ib. 433; 13 ib. 261.

3. The Spanish concession was void for uncertainty. There are no words by which its location can be identified. 11 Howard 63; 13 ib. 261; 16 Peters 156.

4. The survey cannot be referred to, for the purpose of identifying it. That was void by the act of Congress of March 26, 1804. 11 Peters 63, 115; 13 Howard 261.

5. The question then arises, was there any legal or equitable right in Eslava arising under any law of the United States. The statutes in relation to Spanish concessions contemplate the action of Congress on specific reports in which the grantee is recommended to the favorable consideration of Congress. This was the fact in relation to the acts of 1812, 1819, 1822, 1827, and 1829. 2 U. S. Statutes at large 713;

3 ib. 528, 699, 707; 4 ib. 239. Under none of these acts, prior to 1829, did Eslava obtain a favorable report. His claim was rejected under each one of the previous acts. The act of 1829 allowed claimants of a single class to file their claims. Under the third section of the act, the claimant must show: 1. That, on the 15th day of April, 1813, he was a resident of the country between the Perdido and Pearl rivers, in the Spanish territory; 2. That, prior to that day, he had held, for ten consecutive years, a tract of land not claimed by any other person; 3. That he had possession at the date of the act. The register and-receiver reported favorably on the claim to Congress, according to the act. Congress did not give an absolute, but a qualified confirmation: a confirmation of the rights under the grant and law. Here there is an equitable right under the law, provided the facts can be established upon which the claim rests. Hunt and Gazzam contested this right. The possession required by the act is obviously an actual possession, *pedis possessio*. The claim is acknowledged in consequence of a "ten years' consecutive possession," ten years being the ordinary Spanish prescription. Such a possession implies occupancy, and visible, notorious works of ownership, showing that the party controls the property under claim. The definition of such a possession, as given in the Partidos, always includes the idea of improvement, or visible dominion. 1 Part. 394. The Spanish regulations always exacted improvements, as a condition of title. 11 Howard 63; Tillinghast's Adams 488 *et seq.*

CHILTON, C. J.—This was an action of ejectment, brought by the heirs of Miguel Eslava, to recover certain lands claimed by them under a patent from the government of the United States, issued in pursuance of an act of Congress approved the 3d of March, 1841. The defendants claim title to a portion of the land under a patent from the same source, issued in pursuance of the same act, to Audley H. Gazzam, and which has vested in them by mesne conveyance. It is apparent that the question, as to which of these alleged titles shall prevail, depends upon the construction to be placed upon the act of Congress under which they respectively accrued.

This act is in the following words: "*Be it enacted, &c.,* That

the decision of the register and receiver of the land office for the district of St. Stephens, in the State of Alabama, as contained in their report bearing date the 3d day of May, 1832, confirming a claim of the heirs of Miguel Eslava, deceased, (being claim number 3, in report number 2,) and made in pursuance of the act of Congress approved the 2d day of March, 1829, entitled "an act confirming the reports of the register and receiver for the district of St. Stephens, in the State of Alabama, and for other purposes," be, and the same is hereby confirmed: *Provided*, That the confirmation provided to be made by this act, shall amount only to a relinquishment, forever, on the part of the United States, of all right and title whatever to the land so confirmed or granted; *Provided, also*, That the survey and location hereafter to be made of said claims, which are hereby confirmed, shall be made in conformity with the original Spanish title papers, unless the surveys of said claims be found variant from the grants, according to the usages of the Spanish government; in which case, the grants are to govern.

SEC. 2. *And be it further enacted, &c.*, That after the proper location of the claims hereby confirmed, it shall be the duty of the commissioner of the general land office, to issue patents for the same, containing a reservation of the rights of all third persons: *Provided*, That the said patents shall be construed to convey to the claimants all such legal and equitable rights only, as may exist under the laws of nations, or under the constitution and laws of the United States, or treaties applicable to the said grants, under and by virtue of the said Spanish grants; and it shall be also the duty of the commissioner of the general land office, forthwith to issue patents to Jonathan Hunt and Audley H. Gazzam, for all such portion of said lands for which they now hold receipts issued by the receiver of the land office at St. Stephens, in the State of Alabama; which patents shall contain an exception and reservation of all the rights of the Spanish grantees, their heirs or assigns, under the titles claimed by them under the Spanish government: *Provided*, That the patents issued to the said Hunt and Gazzam, shall be construed to convey to them all such rights only as are not inconsistent with the legal or equitable rights of the Spanish grantees, their heirs or assigns, under the laws

of nations, or under the constitution and laws of the United States, or treaties applicable to said grants, under and by virtue of the Spanish grants hereby confirmed."

The better to comprehend the true intent and meaning of the foregoing enactment, it is proper that we briefly recur to the circumstances which gave rise to it.

Miguel Eslava, the father of the lessors of the plaintiff, holding the office of military store-keeper under the Spanish government, at the port of Mobile, in consideration of his services rendered the king of Spain, and in anticipation of a treaty, by which the province in which he resided was to be transferred to the French Republic, or to the United States, solicited, by petition to the Spanish commandant, of the Spanish government five thousand superficial arpents of land on bayou Durand, a league from Mobile.

In consequence of the death of the assessor of the intendancy, the land office was closed, but a temporary concession was made, to enable the petitioner to make the necessary clearings and erect suitable buildings; but the grant was upon the express condition, that, as soon as the office of the intendant general of the province should be open, the petitioner should have a valuation of said lands made in conformity with the regulations of that office respecting lands, and should forward the proceedings to the superintendent for the purpose of obtaining a regular title. This was done on the 25th day of February, 1803.

In 1814, Eslava presented his claim before the United States commissioner, predicated upon this concession, and what purported to be a survey by Joseph Collins, the deputy surveyor of the port of Mobile, but it was rejected. (3 Amer. St. Papers 14.) It was again presented by him in 1827, but again rejected. (5 ib. 124.) Finally, he having died, his heirs presented the claim before the register and receiver of the land office at St. Stephens, under the third section of the act of Congress of the 2d of March, 1829. This section provides: "That every person or persons, or the legal representatives of such person or persons, who, on the 15th day of April, 1813, had, for ten consecutive years prior to that day, been in possession of a tract of land, not claimed by any other person, and not exceeding the quantity claimed in one league

square; and who were, on that day, resident in that part of Louisiana situate east of Pearl river and west of the Perdido, and below the thirty-first degree of north latitude, and had still possession of such tract of land, shall be authorized to file their claim, in the manner required in other cases, before the said register and receiver for their decision thereon: and it shall be the duty of the said register and receiver, to hear and record the evidence offered to support such claim; and if the same shall be established by sufficient proof, agreeably to the provisions of this section, the said officers shall, in their report, recommend the confirmation of the right to such claim as in other cases," &c.    4 U. S. Stat. at large 358-9.

The register and receiver, having investigated the claim of the heirs of Eslava, reported favorably upon it, as falling within the provisions of the act above recited, and their report was forwarded to the general land office on the 3d of May, 1832.   See 5 Amer. St. Papers 124.

In the meantime, Jonathan Hunt and Audley H. Gazzam had made entries embracing portions of the land supposed to be claimed by the heirs of Eslava, and when the report of the register and receiver was laid before Congress for final action and confirmation, they contested their right before Congress; and to settle this controversy, the act under consideration was passed.

The plaintiffs say that their title, as reported by the register and receiver at St. Stephens, for confirmation, was confirmed; and that thereby the fee, which up to that time was in the United States, immediately became vested in them, and that the act makes the title of Hunt and Gazzam subservient to theirs.

It is true, the first section of the act does confirm the report of these officers, and had it stopped there, this difficulty would hardly have arisen; for there could have been no doubt of the intention of Congress to confer the title which was in the United States absolutely on the plaintiffs, subject to the limitations contained in the provisoes. And we may venture to assert, that if the controversy between the parties before Congress involved merely a question of boundary, the act would have stopped here, or it would merely have superadded, that Hunt and Gazzam should have a patent for so much of the

land claimed by them as was not embraced in the claim of Eslava's heirs. But it does not stop here. On the contrary, it contains other provisions, which, so far as they explain and qualify the first section, must be regarded by us; for "a law is the best expositor of itself; and every part of an act is to be taken into view, for the purpose of discovering the mind of the legislature." Pennington v. Coxe, 2 Cranch 52; ib. 358; 1 Brock. C. C. R. 162.

The second section provides, that after the proper location of the claims thereby confirmed, the commissioner of the general land office shall issue patents for the same, containing a reservation of the rights of third persons; and it then declares what shall be the legal effect of these patents, namely: that they shall be construed to convey to the claimants "all such legal and equitable rights only as may exist under the laws of nations, or under the constitution and laws of the United States, or treaties applicable to said grants, under and by virtue of said Spanish grants." It then proceeds to make provision for arming Hunt and Gazzam with the evidence of legal title to the lands claimed by them. Patents are to issue to them for portions of the same land, but these patents are to contain an exception and reservation of all the rights claimed by the Spanish grantees, their heirs and assigns, under the titles claimed by them under the Spanish government; that is to say, these patents to Hunt and Gazzam "shall be construed to convey to them all such rights only as are not inconsistent with the legal or equitable rights of the Spanish grantees, their heirs or assigns, under the laws of nations, or under the constitution and laws of the United States, or treaties applicable to said grants, under and by virtue of the Spanish grants hereby confirmed."

If the effect of this act be, to confer the land upon Eslava's heirs, irrespective of the fairness or validity of their claim derived under the Spanish government, then, all that is said in the second section about the patents to Hunt and Gazzam, is useless and nugatory. So also, if Congress, by this act of confirmation, designed to create an equity which did not previously exist in favor of Eslava, under the laws of nations, or treaties, or constitution and laws of the United States, then the act is repugnant and suicidal, in conferring on Hunt and

Gazzam a title which this equity was designed to over-ride and destroy. But the act is susceptible of a construction which gives effect to all its provisions, and renders it neither repugnant nor absurd. It was designed to meet and provide for every phase which the controversy before Congress had assumed. Eslava's heirs contended that they had a claim upon the government in virtue of their Spanish concession; and if this, under the treaties with France and Spain, and the laws of nations, imposed no obligation on this government, then that their claim fell within the third section of the act of 1829. The claim upon all these grounds being contested by Hunt and Gazzam, who claimed to have purchased a portion of the land from the United States, Congress, without undertaking to decide upon the questions at issue between the parties, determined to furnish them both with the evidence of a legal title, so that each might have a standing, *prima facie*, in court, and thus be enabled to settle the difficulty by a judicial determination. In order, however, to protect the rights of the Spanish claimants, and to confer upon them all the benefits which this government, in the exercise of its political power, was accustomed to secure to those who held under imperfect or equitable titles, certain rules were prescribed by which the court, in " construing" the patents, should be governed; that is to say, the patent to Eslava's heirs shall be construed to convey " all such legal and equitable rights only" as may exist under and by virtue of said Spanish grants : 1st. Under the laws of nations; 2d. Under the constitution and laws of the United States; 3d. Under treaties applicable to said grants. On the other hand, the patents to Hunt and Gazzam shall be construed to convey to them all such rights only as are not inconsistent with the legal or equitable rights of the Spanish grantees, under and by virtue of the Spanish grants confirmed by the act, existing under the laws of nations, the constitution and laws of the United States, and treaties applicable to said grants.

Let us briefly consider what right the heirs of Eslava have, in virtue of their alleged Spanish concession, under the laws of nations.

In the United States v. Reynes, 9 How. 127, it was held, that a grant from the Spanish authorities, after the treaty of

St. Ildefenso, although at the time of the grant, and for several years afterwards, Spain had the actual occupation of the province in which the land granted was situate, was void. It was also further held, that such grant was not protected by the treaty of Paris between the United States and France, of the 30th September, 1803, stipulating for the protection of the citizens of Louisiana in the free enjoyment of their liberty and property, as the term "property," in the correct acceptation, was applicable alone to possessions or rights founded in justice and good faith, and based upon authority competent to their creation. The doctrine announced by this case, has been repeatedly re-asserted by the same court. United States v. D'Auterive et al., 10 How. 609 ; Montault et al. v. The United States, 12 ib. 47 ; The United States v. Pillerin, 13 ib. 9. These decisions very clearly show, that the grant from Orsono to Eslava was void; and being void for this reason, it is unnecessary that we examine the other objections raised to it, of uncertainty in respect of the land granted, and the failure of Eslava to comply with the conditions upon which he was to have a title in form by the Spanish government.

As the act of 1841 gives to the claim of the plaintiffs a qualified confirmation only, ripening into a legal, available title any right, legal or equitable, which accrued to them in virtue of their Spanish grant, or possession held under it, under the laws of nations, treaties, or constitution and laws of the United States ; and having shown that, according to the repeated decisions of the Supreme Court of the United States, the grant was void, and conferred no right under the laws of nations or the treaties, let us turn to the last consideration : whether the laws of the United States confer a title upon them, otherwise than as given in charge by the Circuit Court, whose decision we are revising.

The plaintiffs rely upon the act of 2d March, 1829. Their claim under the previous laws passed for the benefit of persons resident in the ceded territory, had been, up to that time, rejected. In order to bring them within that act, three things are necessary : 1. Residence in that part of the country east of Pearl and west of Perdido rivers, and below the thirty-first degree of north latitude, on the 15th day of April, A. D.

1813; 2. Possession for ten consecutive years prior to that date; 3. Possession of the tract claimed on the 2d March, 1829, the date of the passage of the act.    4 Stat. at large, 358.

As to whether the possession required by this act must be an actual, *pedis possessio*, or may be constructive merely, is not properly before us for decision; for the court below charged the jury that either was sufficient, so that it was defined in such manner as to render it practicable to separate the tract so passed and claimed from the public domain.    But it is insisted on the part of the plaintiffs, that their claim having been submitted before the register and receiver, the proof having been taken, and a decision predicated on that proof made by them in their favor, the action of these accredited officers is binding upon the government; and to this point we are cited to Bissell v. Penrose, 8 How. 339, and Lytle v. The State of Arkansas, 9 ib. 333.    In the first case it is said:    "In cases where the report recommends the confirmation of the claim according to the survey, the effect of the confirmation under the act of 1836 is, probably, to conclude the government; so that an error in the private survey cannot be corrected on a re-survey of the tract;" but it is added : "when recommended in the general form of the present case, any such error may be corrected, agreeably to the intention of Congress, in declaring, as they did in the act of 1806, that these surveys should be regarded only as private surveys;" thus showing that where the report is specific, and is confirmed, then the confirmation becomes specific, and the government is concluded by the specifications contained in it; but it is very certain that Congress was not bound to confirm the report, as to each claim recommended for its confirmation by these officers.    The numerous acts which have been passed upon the subject of organizing such boards, seem to contemplate their action as furnishing a basis for the final action of Congress.    If their action was final, then the confirmation of the reports by Congress was a matter of supererogation.    In the case of Lytle v. The State of Arkansas, the determination of the register and receiver of the land office, in the matter of a contested pre-emption right, was held final, for the reason that Congress had invested them with the power of deciding, and allowed no appeal; a very different

case from the one before us, where the officers were required to prepare abstracts of their reports, embracing the substance of the proof, and transmit them to the proper department, that the same might be laid before Congress, "for their determination thereon." 2 Stat. at large 716 § 7; 3 ib. 528, 699, 707; 4 ib. 239.

The report is only conclusive, so far as made so by the act of confirmation, and this act, as we have endeavored to show, limits and restricts the effect of the confirmation, and the patent to be issued thereupon, to a conveyance of such legal or equitable right as existed under the grant and the laws and treaties applicable to it. All the title which the United States held, and which was not inconsistent with the legal or equitable title of the plaintiffs, as above limited and restricted, to the land for which Hunt and Gazzam held the receiver's receipts, was vested by the act and patents in the latter. We think, therefore, that the question of possession was not concluded by the act and confirmation, but was open to be controverted by the parties.

The construction which we feel constrained to put upon this act of confirmation, distinguishes this case from the numerous decisions predicated upon the doctrine of relation. It is certainly true, that the United States, in the exercise of their political power, could recognize, and often have recognized as valid, claims which, *stricti juris*, create no obligation upon the government, and which, when confirmed, may relate back to their inception. But the act of 1841 was not designed to give validity to that which possessed none before; but merely, by a confirmation of the report, and the issue of a patent, to vest in the plaintiffs a legal title, the efficacy of which as such was to depend upon the existence of their legal or equitable rights, growing out of the Spanish concession to their ancestor, as recognized by the laws of nations, the treaties, or laws and constitution of the United States. What these legal or equitable rights are, Congress did not attempt to define; nor were they in any wise affected by the act. The court below, therefore, very properly went into an inquiry concerning them; and guided by the decisions of the Supreme Court in analogous cases, we are of opinion, that the charges of the circuit judge were fully as favorable for the plaintiffs as the law will warrant.

We have duly considered the argument of the counsel for the plaintiffs, which endeavors to deduce a right to the land in controversy, or to enforce an equitable obligation on the United States to confer it upon the plaintiffs, from the void grant of Eslava, his survey defining the limits of such grant, and his possession under it. Without stopping to inquire whether these did not furnish plausible grounds for a resort to the political power of the government, we think it quite clear, that when considered in the courts of justice, if the possession does not bring the plaintiffs within the act of 1829, the void grant, and the survey made of the land supposed to be granted after the passage of the act of 26 March, 1804, prohibiting such survey under a heavy penalty, (2 Statutes at large 289,) and the possession short of ten years, conferred no title whatever, and created no obligation upon the United States to recognize their claim.

If the possession by Spain of the ceded province was wrongful after October, 1800, and her officers had no authority to make grants, or to dispose of the public domain, so as to bind the United States, as was held in 9 How. 127, and several subsequent cases, we are at a loss to perceive how the prohibited survey of the 20th April, 1804, or the possession of Eslava, either actual or constructive, could confer any right upon the claimants, aside from legislation on the part of the United States. True, if this government chooses to recognize such claim as valid, by its specific action in the confirmation of favorable reports made by its officers charged with their investigation, the title passes from the government to the claimants, and no one has a right to controvert it with them. But as the United States is in such cases the source of title, and confers it upon the claimants more as a matter of favor, prompted by a sense of moral duty, than as fulfilling a strict legal obligation, Congress has the unquestioned right to prescribe the terms upon which the title will be conferred, and to declare the effect of the confirmation as it respects other antagonistic claims. In other words, as was decided in Bagnell et al. v. Broderick, 13 Peters 436–450, " Congress has the sole power to declare the dignity and effect of titles emanating from the United States." See, also, Hall et al. v. Doe *ex dem.* Root, 19 Ala. Rep. 378–394. In

the case before us, Congress has declared, in no equivocal terms, what shall be the effect of the titles conferred upon the parties respectively.

The vice of the plaintiffs' argument, which attempts to deduce an estoppel against the government, as binding upon those claiming under it, from the confirmation of the report, the relinquishment of title to the plaintiffs, and the issue of a patent to them, consists in its being predicated upon a partial view of the act of 1841, and not upon a consideration of the whole act. It proceeds upon the idea of an absolute confirmation and investiture of title, unqualified and unrestricted by the second section of the act, except as respects the location of the land. But this, we have seen, is not the proper construction of the statute. The government may well be estopped from denying that either Eslava's heirs or Hunt and Gazzam have a title to the land embraced in the receipts of the receiver given to the latter, (H. and G.) Congress has declared that patents shall issue to both for the same land, and both are owners against the government; whilst, as between themselves, the title in the one or the other depends upon the existence of the legal or equitable rights of the plaintiffs, "under the laws of nations, the constitution and laws of the United States, or treaties applicable to said grants, under and by virtue of the said Spanish grants." If the right in Hunt and Gazzam be not "inconsistent" with the "legal or equitable rights" of the plaintiffs, as above enumerated, then their title is to prevail.

It is quite manifest, we think, that Congress was legislating with respect to the right or title, and not merely with respect to the identity of the land. The language of this act is not unlike that employed in other statutes authorizing claimants to test the validity of their claims by judicial investigation, so far as the inquiry into the character of the title is concerned.

By the second section of the act of 1824, since revived and extended, the District Court was to settle, by final decree, the validity of the title, " according to the law of nations, the stipulations of any treaty, and the proceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the government from which it (the

title) is alleged to have been derived," &c. 4 Stat. at large 53; ib. 676. This analogy to the previous legislation serves to strengthen our conclusion, that, in "construing" these patents, we must look beyond the qualified confirmation, to ascertain the plaintiff's rights; and at the same time shows, that the numerous decisions under the former acts are not inapplicable to this case, but furnish us guides on which we may safely rely.

After the best consideration which we have been enabled to bestow upon this case, we have unanimously arrived at the conclusion, that there was no error committed by the Circuit Court prejudicial to the plaintiffs, and the judgment is consequently affirmed.