## PEDRO DE DIEGO, Plff.,

*v.*

## ROVIRA ET AL., Dfts.

---

San Juan, Equity, No. 969.

IRRIGATION RIGHTS.

*Irrigation—Civil Code—Law of Waters.*

1. The law governing irrigation waters primarily is that found in

---

NOTE.—For admissibility of photographs as evidence, see notes in 35 L.R.A. 802 and 51 L.R.A.(N.S.) 843.

As to effect and conclusiveness of photographs introduced in evidence, see note in 15 L.R.A.(N.S.) 1162.

As to forfeiture of rights in water by nonuser, see note in 41 L.R.A. 758.

IX. Porto Rico.—2.

De Diego v. Rovira.

the Civil Code, book 2, tit. IV., and anything not covered thereby is determined by the provisions of the law of waters.

Evidence—Maps.

2. Maps are more satisfactory as evidence than oral testimony where a long period of time has expired.

Evidence—Photographs.

3. Photographs are evidence of the highest value to show the contemporaneous condition of affairs, when taken by a competent photographer.

Injunction—Irreparable Damage.

4. Irreparable damage is suffered when one is deprived of some right of property which is essential to its full use, and the question is not whether the damage can be estimated in money; neither can a defendant deprive a plaintiff of a property right simply because the plaintiff may be able at his own expense to supply something to take its place in part.

Government Concessions—Presumptions.

5. The power of the Spanish officials to grant concessions, which they did grant, will be presumed until the contrary is shown.

Concessions—Third Parties—Construction.

6. One cannot attack a concession because it is shown that others had certain rights in the concession, unless he can show that he is connected with them.

The general rule is that a grant is to be strictly construed against the grantee.

Concessions—Forfeiture for Nonuser.

7. Rights once acquired are presumed to continue unless the contrary is shown, and this applies to concessions which are attacked as forfeited because of nonuser.

Opinion filed June 14, 1916.

———

*Mr. F. E. Neagle* for plaintiff.

*Mr. H. R. Francis* and *Eduardo Capó* for defendants.

De Diego v. Rovira.

HAMILTON, Judge, delivered the following opinion:

In this case a temporary injunction has heretofore been granted on the bill and affidavits. (See opinion Feb. 26, 1916.) The cause afterwards came on for final hearing; a large amount of oral and documentary evidence was introduced, it was argued by counsel, and by agreement of parties the judge visited the *locus in quo.*

1. The subject of irrigation is governed in Porto Rico by two laws: first, the Civil Code, and second, what is called the Law of Waters.

The Civil Code was adopted in its present form in 1889, both for Spain and Porto Rico. Book 2 thereof relates to property and ownership, and title 4 under this head is concerned with waters. Sections 414, 415 determine what are of public and what private dominion, as follows:

"Sec. 414. To the public domain belong:

"1. Rivers and their natural beds.

"2. Continuous or intermittent waters from sources or brooks running in their natural beds, and the beds themselves.

"3. Waters rising continuously or intermittently in lands within the same public domain.

"4. Lakes and marshes formed by nature on public lands, and also their beds.

"5. Rain water running through ravines or sandy beaches, the beds of which may also belong to the public domain.

"6. Subterranean waters existing on public lands.

"7. Waters found within the zone of operation of public works, even when they are executed by a grantee.

"8. Waters flowing continuously or intermittently from tene-

De Diego v. Rovira.

ments belonging to private parties, to the People of the United States, to the People of Porto Rico, or to the municipalities thereof, from the moment they leave such tenements.

"9. The waste waters of fountains, sewers, and public institutions.

"Sec. 415. To private dominion belong:

"1. Waters, either continuous or intermittent, rising on private tenements, as far as they run through the same.

"2. Lakes and marshes, and their beds, when formed by nature on the said tenements.

"3. Subterranean waters found on the same.

"4. Rain water falling on private tenements, as long as they remain within the boundaries of the same.

"5. The beds of flowing waters, continuous or intermittent, formed by rain water, and those of brooks crossing tenements which do not belong to the public domain.

"In every drain or aqueduct, the water, the bed, the sloping bank, and the sideways are considered as an integral part of the tenement or building for which the waters are intended. The owners of tenements through which, or along the boundaries of which the aqueduct passes, cannot allege ownership over the same nor any right to profit by its beds or sideways, unless they base their claims on title deeds, specifying the right or the ownership claimed by them."

Chapter 2, on the use of public waters, is composed of three sections, as follows:

"Sec. 416. The use of public waters is acquired:

"1. By administrative concession.

"2. By prescription after twenty years.

"The limits of the rights and obligations of these uses shall

De Diego v. Rovira.

be those shown, in the first case, by the terms of the concession; and in the second case, by the manner in which the waters have been used.

"Sec. 417. Every concession of the use of waters is understood to be without injury to third persons.

"Sec. 418. The right to make use of public waters is extinguished by the lapse of the concession and by nonusage during twenty years."

Chapter 3 relates to the use of waters of private ownership. Its five sections are as follows:

"Sec. 419. The owner of a tenement in which a spring or brook rises, be it continuous or intermittent, may use its waters as far as they run through the said tenement; but after the said water leaves the tenement it shall become public and its use is governed by the special Law of Waters.

"Sec. 420. Private ownership of the beds of rain waters does not give a right to make works and constructions which may divert the course of such waters to the injury of a third person, nor those, the destruction of which by the force of floods, may cause such injury.

"Sec. 421. No one may enter private property in search of waters or make use of them without permission from the owners thereof.

"Sec. 422. The dominion which the owner of a tenement has over the waters rising thereon does not injure the rights which the owner of a lower tenement may have legally acquired to the use thereof.

"Sec. 423. Every owner of a tenement has a right to construct within his property receptacles for rain water, provided he does no damage thereby to the public or to a third person.'"

De Diego v. Rovira.

Chapter 4 relates to subterranean waters, and the concluding chapter 5 of the title contains general provisions, more or less apposite, as follows:

"Sec. 427. The owner of a tenement on which there are defensive works to check waters, or on which, by the variation of their course, it may be necessary to reconstruct them anew, is bound, at his option, either to make the necessary repairs or constructions, or to permit that, without damage to him, the owners of the tenements who suffer or are clearly exposed to suffer damages, should make such works.

"Sec. 428. The provisions of the preceding section apply to the cases in which it may be necessary to clear a tenement from the material, the accumulation or fall of which may obstruct the course of waters, to the injury or danger of a third person.

"Sec. 429. All the owners who participate in the benefits arising from the works to which the preceding sections refer shall be bound to contribute to the expenses of their several interests. Those who by their own fault may have caused the damages, shall be liable for such expenses.

"Sec. 430. The ownership and use of waters belonging to corporations or private persons are subject to the law of eminent domain for reasons of public utility.

"Sec. 431. The provisions of this title shall not cause injury to rights previously acquired, nor to the private dominion of the owners of waters, drains, fountains, or springs by virtue of which they use, sell, or barter them as private property.

"Sec. 432. Anything not expressly determined by the provisions of this chapter shall be governed by the special Law of Waters."

The general Law of Waters, therefore, is contained in the sec-

De Diego v. Rovira.

tions above quoted so far as they are applicable, and anything not expressly so determined shall be governed by the special Law of Waters.

The Law of Waters, specially so called, is made up of 259 articles, as translated in the Compilation of the Revised Statutes of Porto Rico, being §§ 2387–2645. This special Law of Waters was a Spanish statute dated June 13, 1879, and extended over Porto Rico by a royal order of February 5, 1886. This has been amended by Act of March 12, 1903, but not in any respect affecting the present case.

The law of this case, therefore, is to be found in one of these two statutes, that is to say, primarily in the Civil Code, and in default of regulation thereby, in the special Law of Waters.

2. The importance of water in Porto Rico, especially on the south side of the Island, cannot be overestimated. The land lends itself readily to cultivation, particularly of sugar cane, and water is an absolute necessity for that purpose. As has been noted in other cases, the Porto Rican rivers on the south side of the Island are, in their lower reaches, almost guiltless of water during much of the year. For some distance down from their sources, however, running water is found, and is, as in the case at bar, frequently the cause of contention. The very object of the Law of Waters was to declare fixed rights and provide means for enforcing them. It is in this manner that streams small in size are important in use, and even rivulets or quebradas, which in most of the United States would not even be called creeks, but probably branches, if not under the denomination of rivers here, nevertheless are under the laws which govern public waters. The quebrada Caimital at the place in question must therefore be treated as public water, and subject to the laws

De Diego v. Rovira.

governing public waters. The use of such waters has not been consistent at all times and places. A law of waters was in force in Porto Rico from and after September 26, 1866, and there was a royal order of July 11, 1867, providing for the study of irrigation on the Island, and there were circulars, notably No. 117, dated February 29, 1868, relative to water concessions. Much earlier than this, however, there were elaborate irrigation plans and systems authorized by law in Porto Rico, and carried into effect. There exists a file in the Insular archives concerning the distribution of waters from the creek Piedra Gorda, beginning October 12, 1850, and ending, for the time being, February 24, 1854. This name would seem to be that of what is in this suit called at one point the Quebrada Caimital, although this is accompanied by a map which it is difficult to reconcile with subsequent conditions. However, this file shows that somewhere on the quebrada was an elaborate system of intakes (presas), and canals therefrom, supplying different haciendas for sugar cane (cañas), at which different people have water rights during different days of the month. Maps are the most satisfactory kind of evidence, where they apply. The recollection of witnesses is generally indistinct as to particular periods, inasmuch as they testify to conditions obtaining during continued periods of time, while a map shows the circumstances existing at a fixed date. The probability is that the property on this plan of 1850 was at a different place from the property now in question.

Much more certain is the map (plano) of the property (estancia) of Bernardino Mandez of December 15, 1864, also in evidence, as showing the lay of the plaintiff's land having come down to him as one of his muniments of title. This seems to

De Diego v. Rovira.

show the plaintiff's property as having its west front of about 800 varas on a quebrada dividing it from Florencia Capó. The next owner on the south is Maximino Luzunaris, whom the testimony shows to have owned part of the land now in the possession of Capó. The plaintiff's property, however, at that time, as now, faced south about 200 varas on another quebrada, whose connection with the first is not shown. This seems to be what is called the Minondo by several of the witnesses, and Piedra Gorda by others. This stream near its mouth is now called the Creo quebrada. Its mouth on the map of 1868 is called Boca del Mangle, a name given also by a witness in the case.

3. Photographs are evidence of the highest value of the condition of affairs at the time they are taken. In the case at bar, some of those that were offered were at first excluded because they had on their back memoranda purporting to show the subject matter. The writing was afterwards erased and the photographs admitted, after it was shown when they were taken and that the work was done by a competent photographer. Three of these show the condition of the dam about the time the suit was brought, and the evidence indicates there has been no material change in the situation. One shows the quebrada above the dam, with a fairly large stream, which is turned off to the right by the dam. The wall of the dam appears from the photograph, as it did from actual inspection, to be made up of a lower brick portion, and about a foot added above, composed of cement work. Below the dam is shown the neighborhood road, crossing the bed of the stream, and on the other side a wire fence. The canal into which all the water at present flows is given in another photograph, its sides being lower than the cement por-

De Diego v. Rovira.

tion of the dam above spoken of. It would seem that the original brick dam was on about the same level as the walls of the canal. Another picture, taken below the dam, not only shows the added cement work, but also that the cement is plastered down upon the original brickwork underneath. Outside the dam is a pool of water, and on the other side, a few feet upstream, is the steep cement canal bringing the water from Guamani canal down into the quebrada above the dam. This water, however, is not always turned on. Another picture shows the quebrada passing under a wire fence below the dam. Here, as everywhere, are rocks, many of large size, along the edge and in the channel of the quebrada. Lower down, the quebrada is overgrown with grass, and except for the presence of a channel with distinct banks, would not be known as having anything to do with a stream of water at all. The last photograph in evidence shows two of the dairy buildings on the slope of the hill overlooking the quebrada, and a pool of water among the rocks in the bed of the stream. Ocular inspection showed that near these buildings is a pool of water, and that there are others at different places, as well as a few springs in the side of the quebrada; but that throughout most of its course it is at present perfectly dry, despite the fact that half the water has been turned into it at the dam, under the injunction in this case. At one point there are the remains of a fire, with coals and burnt tree limbs, apparently the site of a charcoal operation. Nevertheless, at different points there are pools, evidently coming from the water of the quebrada filtering through the soil from the dam above. While during the present period of drought there is little water on the surface, there is evidently water beneath the surface available by pools, whether natural or artificial. After the quebrada

De Diego v. Rovira.

leaves the plaintiff's property it is practically a dry bed, although quite wide, and stretching with well-defined banks past ceiba and other trees for hundreds of yards until it joins the larger quebrada, called in the evidence Minondo. Where the Caimital joins it this Minondo or Piedra Gorda quebrada is even now quite a large living stream of water, flowing down from the broken country over to the northwest. All the neighborhood is well cleared, except in places along the Minondo, which has high banks, and is suitable either for pasturage or for cane raising.

4. This is a bill to enjoin the diversion of the water of the Quebrada Caimital into the defendants' canal by means of a dam, which, it is alleged, in its present condition prevents natural and usual flow of water past the plaintiff's 280 cuerdas range and dairy. The plaintiff claims that the canal is a new use of the water, or at least a use which had been previously abandoned, and by depriving him of water for his stock causes him irreparable damage. Plaintiff does not claim a concession of the water, or, indeed, any special easement or right in connection with the water of the quebrada. For him the quebrada Caimital is a flowing stream at which he has the right which he has always exercised, of watering his stock. It is evident, therefore, that the question of right to this water is involved, and also that of damage to the plaintiff. The second, being a simpler question, may be examined first.

Irreparable damage is suffered when one is deprived of some right of property which is essential to its full use. The question involved is not whether there may not be an equivalent found in damages. All property rights can be estimated in dollars and cents. But each property owner is entitled to use his property

as seems to him best, and if this right is seriously impaired, it constitutes irreparable damage. The plaintiff is entitled to use his large finca as a cattle range and dairy farm, and the testimony shows that he has so used it for many years. It is true that the part near the creek is also shown to have been used at one time as a brickyard, which requires water; but that is not now the case, and is immaterial. If the use as a dairy had begun over a year ago, the time would be sufficient. This would make up the period of a year and a day which in some aspects of the case might be material.

The defendants, however, say that conceding this, the plaintiff has long had a well upon the place, and two years ago built two watering troughs connected with the irrigation service, and therefore is not dependent upon the quebrada. This, however, is no answer. The well is shown by evidence, and can be seen by visual inspection, to be almost unusable and inaccessible· in droughts, which are so frequent on the south of the Island, while the troughs constitute an additional water right, which the plaintiff has himself added at his own expense. The defendants cannot deprive the plaintiff of a right because the plaintiff may be able at his own cost to supply something partly taking its place.

There is more question as to the use of the quebrada Minondo, into which the Quebrada Caimital empties, for watering purposes. This quebrada, really the Piedra Gorda, is a flowing stream, more suitable in itself than the Quebrada Caimital. Its banks are high, however, and the space owned by the plaintiff is small. It is distant from his improvements, and legally does not remove the objection of irreparable damage suffered by cutting off the Quebrada Caimital. If the plaintiff has a right to

De Diego v. Rovira.

the use of the Quebrada Caimital for watering purposes he is entitled to use that right, and there is evidence tending to show that he has always used it. The defendants could not cut off one right of the plaintiff just because he happens to have another, even if that other were more of an equivalent than in the case at bar. The point of irreparable damage growing out of depriving stock of their old and convenient watering place is, therefore, made out on the evidence:

5. To establish his right of user the plaintiff must show either that he has a concession, or that he has had the use of the Caimital waters. He does not set up any concession, and a careful examination of the facts in evidence tends to show great confusion in the testimony as to user. The defendants not only deny the user by the plaintiff, but set up that they have a concession for the use of all the water of this quebrada, known indiscriminately here as the Caimital and the Quebrada Arriba. It will be necessary, therefore, to examine the evidence with some care.

The evidence seems to show that one Juan Donzac at one time owned 10 cuerdas of land where the canal starts from the dam in question, as well as a great deal of what is called the Caimital plantation, west of the Quebrada Caimital. All the deeds are not in evidence, and it can only be said that in 1853 Donzac made a deed to one Capó, ancestor of the defendants Capó, for the land in question, and also his water concession. There is some testimony, particularly that of an old negro who was a slave of Juan Donzac, that Donzac was the man who built a brick dam across the quebrada, and also the canal which conducted the water westwardly therefrom to the Donzac lands. The concession of Donzac for this purpose is not in evidence, and

De Diego v. Rovira.

perhaps is not in existence. The evidence there is on the subject consists of a report by the mayor of Guayama, the nearest town, made September 24, 1868, in conformity with royal orders of August 8, 1866, and more particularly June 25, 1868. This was in connection with the circular above mentioned giving directions how applications for water rights should be made in future, and, as a foundation therefor, directing the local authorities to forward tabulated statements showing the water concessions existing in their respective jurisdictions, all on certain forms which were furnished. In accordance therewith the following was reported (pages 56 and 57):

"Department of Guayama. Statement of the water franchises existing in this department.—Rivers which empty into the sea. Guamani. Name of the place of the intake: Piedras and Hucar. Nature of the works: Masonary dam. Canal of derivation and canal ditch. Length: 16 hectares. Source of the water: Stream of Quebrada Arriba.—Purpose of the concession: Irrigation of canes and water supply for the steam engine.—Volume of water granted: The whole creek.—Area of land irrigable according to the concession: More than 100 hectares. District in which the dam is located: Guayama. Remarks: From this irrigation the plantation of Jose Sabater and the Curet sisters participate on certain days."

"Department of Guayama. Statement of the water concessions existing in this department.—Districts: Guayama.— Source of the waters: Stream of Quebrada Arriba. Purpose of the waters: Irrigation of canes and water supply to the steam engine. Nature of the concession: Unknown. Date of the concession: Unknown. Name of the first grantee: Don Juan Donzat. Volume of water granted: The whole creek.—

De Diego v. Rovira.

Extension of land irrigable under the concession: More than 100 hectares. Remarks: From this irrigation the plantations of Don Jose Sabater and the Curet sisters participate on certain days."

Such certificates were frequently made by officials by direction of the Spanish government. These were on the same basis as the celebrated Doomsday Book of England, and similar commissions were frequent also as in France. They are found in Florida under the Spanish rule. There such an inquiry was the basis of every government grant, for in the lack of public surveys, such as were instituted at an early period in the United States, such inquiries were necessary before a public grant could be safely made. Colonial Mobile, 2 ed. 323, 329 *et seq.* Eslava v. Bolling, 22 Ala. 721. The Spanish officials are presumed to have been possessed of the power which they exercised unless the contrary is shown. United States v. Arredondo, 6 Pet. 729, 8 L. ed. 561. Even where a formal grant has not been made, the United States are bound, provided the preliminary steps or a private right to them is shown. Colonial Mobile, 2d ed. p. 360.

It follows, therefore, that at least for the purposes of this case a concession must be held to have been made to Juan Donzac in accordance with the report above mentioned. It is to be observed that the concession on its face shows its purpose to have been "irrigation of canes and water supply for the steam engine." And the volume of water granted was "the whole creek."

6. The plaintiff claims, however, that this concession is not complete, in that it is on its face said to permit the participation on certain days of the plantations of Jose Sabater and the Curet sisters. But the plaintiff does not connect himself with either

De Diego **v.** Rovira.

of these parties, or either of the plantations. The concession is to Juan Donzac, and whatever may have been the rights of Sabater and the Curet sisters against him, this does not concern the plaintiff, who does not connect himself with either of them. So far as the plaintiff is concerned, the concession is complete.

A more serious question is connected with the terms of the grant as covering "the whole creek." If this is literally true at the present time, the defendants have the perfect right to increase the height and length of the dam. The general rule in Spanish, as at common law, however, is that a grant is to be strictly construed. Re Hermanos, 8 Porto Rico Fed. Rep. 605. Paragraph 10 of the circular of 1868 above quoted provides that "all concessions heretofore granted not providing specifically in liters the volume of water to be used per second, only gives the right to use the amount necessary for the purpose of the original concession." But its nature was, even in 1868, unknown. If all the waters that ever came into the whole creek had been diverted and used under this concession, it would be a practical contemporaneous construction which would control. In point of fact, however, there seems to be no evidence that before 1914 the dam was ever above the height that it was originally, and only the amount of water kept back by such a dam was turned into the Capó canal. In other words, the practical contemporaneous construction of this concession was that the average water of the quebrada was that which was covered by the concession, and surplus rain water was always permitted to go down the bed of the creek through the property now owned by the plaintiff. In fact the quebrada, after leaving the plaintiff's property, passes through the defendants' property again, and there is testimony that defendants' stock was watered at that

De Diego v. Rovira.

place under a certain ceiba tree. This, therefore, must be held to be the law of the case, and the most the defendants can take by the canal will be the water held back by the dam as originally constructed.

7. The plaintiff contends, however, that, whatever might be the proper construction of the Donzac concession, it has been forfeited by nonuser for twenty years (Law of Waters, § 418).

It is true that, unless the nature of the cultivation of cane has completely changed since 1868, this canal could not irrigate 100 hectares or 250 acres, and at all events such extensive use has never been made of the concession. If that was the purpose, it has been abandoned. Certainly the use for steam engine has been. To determine this, an examination of the testimony is necessary. In the fall of 1868 was the famous cyclone of San Narciso, and there is testimony that the works were completely destroyed thereby. This, however, would seem to refer more to the canal than the dam. Some witnesses also testify that prior to 1899, and others that prior to 1904, cane was not cultivated upon the Caimital plantation, and that the canal was neither used nor needed. Others also testify that water ran freely through the holes in the dam, and around at least one end, until the defendants Rovira leased the Caimital plantation in 1914, and in August of that year made extensive repairs and improvements. But all this is contradicted. It need only be said that the testimony of nonuser is not satisfactory. Certainly the concession is to be held as established. Evidence that it has been lost by nonuser is not clear. (Law of Waters, § 418). There is a kind of *vis inertiæ* which keeps rights in force unless the contrary is proved, and in this case the contrary is not proved to the satisfaction of the court. It is true that the concession is

IX. Porto Rico.—3.

De Diego v. Rovira.

not mentioned in Capó's lease to Diaz, in 1899, and, except in 1853, it is possibly not mentioned in documents until the lease to Hartman in 1904. But it is not shown to have lapsed, and, in fact, there is a great deal of testimony that it was in active use. Possibly the testimony may be reconciled upon the theory that the water which went down the quebrada, as testified by many witnesses, was the surplus that went over the dam after rains, and that much leaked out through cracks in the dam. It would be a very strained construction, however, which would hold that cracks in a dam forfeited the concession to have a dam, and more especially as they were repaired without objection in 1914. It results, therefore, that the concession is still in force.

8. The concession will be construed as limited to the water diverted by the dam as originally constructed and repaired in accordance with the original construction. When the defendants Rovira in 1914 got the use of more water from the irrigation service, and in order to carry that into the canal built the dam higher so as to carry the increase of water, they went beyond the concession to Donzac, and, so to speak, increased the burden or easement resting upon the quebrada. This they had no right to do. If they wish to get additional water from the irrigation service, they must carry it into their canal in some other way than by throwing it into the quebrada. If they throw it into the quebrada, they have no right to complain if the increased water goes over the dam down the stream. On the other hand, however, the plaintiff has no right to this additional water, for which the defendants are paying; and, while it will be necessary to compel the defendants to remove the additional height placed upon the old dam, they will be allowed sufficient

De Diego v. Rovira.

time to do so and enable them to make some other connection between their said canal and the Guamani irrigation canal.

It is so ordered.